**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION**

EDNA SEALS                                                                                          PLAINTIFF

v.                                              No. 4:05CV1638 JLH

CORRECTIONAL MEDICAL SERVICES, INC.                                     DEFENDANT

<u>**OPINION AND ORDER**</u>

This is an employment discrimination case.  Edna Seals, an African-American female,
brought claims against her former employer, Correctional Medical Services, Inc., alleging age
discrimination under the Age Discrimination in Employment Act of 1964 (29 U.S.C. § 631 *et seq.*),
race discrimination and retaliation under Title VII of the Civil Rights Acts (42 U.S.C. § 2000e *et
seq.*), and intentional infliction of emotional distress under Arkansas law.  The defendant has moved
for summary judgment.  For the reasons stated below, this motion is granted in part and denied in
part.

A court should grant summary judgment when "the pleadings, depositions, answers to
interrogatories, and admissions on file, together with the affidavits, if any, show that there is no
genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter
of law."  FED. R. CIV. P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).
The party moving for summary judgment bears the initial responsibility of informing the district
court of the basis of its motion and identifying the portions of the pleadings, depositions, answers
to interrogatories and admissions on file, together with the affidavits, if any, that demonstrate the
absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986);
*Group Health Plan, Inc. v. Philip Morris USA, Inc.*, 344 F.3d 753, 763 (8th Cir. 2003).  When the

moving party has carried its burden under Rule 56(c), the non-moving party must "come forward with 'specific facts showing that there is a *genuine issue for trial*.'"  *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1985) (quoting FED. R. CIV. P. 56(e)).  The non-moving party sustains this burden by showing that there are "genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250.  When a non-moving party cannot make an adequate showing on a necessary element of the case on which that party bears the burden of proof, the moving party is entitled to judgment as a matter of law. *Celotex*, 477 U.S. at 323.  In deciding a motion for summary judgment, the Court must view the facts and inferences in the light most favorable to the party opposing summary judgment.  *Boerner v. Brown & Williamson Tobacco Corp.*, 260 F.3d 837, 841 (8th Cir. 2001) (citing *Rabuska v. Crane Co.*, 122 F.3d 559, 562 (8th Cir. 1997)).  If the evidence would allow a reasonable jury to return a verdict for the non-moving party, summary judgment should be denied. *Derickson v. Fidelity Life Assoc.*, 77 F.3d 263, 264 (8th Cir. 1996) (citing *Anderson*, 477 U.S. at 248).

The Eighth Circuit has said that summary judgment should seldom be granted in discrimination cases where inferences are often the basis of the claim.  *Duncan v. Delta Consol. Indus., Inc.*, 371 F.3d 1020, 1024 (8th Cir. 2004) (citing *Breeding v. Arthur J. Gallagher & Co.*, 164 F.3d 1151, 1156 (8th Cir. 1999)); *Bassett v. City of Minneapolis*, 211 F.3d 1097, 1099 (8th Cir. 2000).  *But see Bainbridge v. Loffredo Gardens, Inc.*, 378 F.3d 756, 762 (8th Cir. 2004) (Arnold, J. dissenting).

**I.**

Edna Seals, a Licensed Practical Nurse, began working for Correctional Medical Services, Inc., in July 1999.  CMS provides healthcare services and medical staffing to jails and prisons throughout the United States, including certain facilities in Arkansas.  Seals began working for CMS at the Pine Bluff Diagnostic Hospital, but was transferred to the Tucker Maximum Security Prison at her request about three months later.  Seals continued working at Tucker for the remainder of her employment with CMS.  In this position, she dispensed medications to inmates, provided treatment to inmates, and reported sick calls.

Deborah Harris, CMS's Director of Nursing, and Charlotte Green, a supervisory employee, conducted Seals's annual performance evaluation on August 5, 2004.  This evaluation showed that Seals met or exceeded the requirements of her position in most respects, but fell below the requirements in a few areas of performance.  In the comments section of the evaluation form, Harris wrote that Seals was a "valuable asset to the team of nurses," and Seals wrote, "I enjoy working here as a nurse."  Until the time that she received this evaluation, Seals enjoyed working at CMS and did not experience any type of behavior that made her think that her working conditions were intolerable.

On September 3, 2004, Seals failed to pass medications to barracks five, six, seven, and eight at Tucker, which was part of her job duties.  One week later, Harris gave Seals a verbal counseling because of Seals's error.  Seals testified in her deposition that she believed that she did not have enough time at work to complete all of her job duties and that this disciplinary action was unfair. When asked, "But the reason you think it's unfair is because you didn't have enough time, not because you think they were doing it because of your age or your race," Seals responded, "Well, on that, no."  Seals now asserts that she "believed Harris wanted her gone because of her race and age."

After receiving the verbal counseling, Seals called Paul Torrez, CMS's Regional Manager, and scheduled a meeting for September 13, 2004.  Seals scheduled this meeting, in part, because of the verbal counseling she had received.

Seals met with Torrez for about one hour.  During this meeting, Seals told Torrez that a white nurse, Lisa Anderson, was allowed to work and play games on a computer, but black nurses were questioned for using it.  Seals also told Torrez that Seals had to come in to work later than other nurses and that she therefore did not have enough time to prepare for "pill passes."  Torrez told Seals that he would attend a staff meeting at Tucker and talk with other employees regarding Seals's concerns.  Seals was satisfied with her meeting with Torrez.

Torrez attended the next staff meeting at Tucker and spoke with other CMS employees. Anderson was disciplined for playing games on the computer.

On September 14, the day after Seals's meeting with Torrez, Harris gave Seals an Action Plan for Time Management.  This action plan documented a change in Seals's work hours from a 9:00 a.m. start time to an 8:00 a.m. start time and changed her shifts from Monday through Friday to Tuesday through Friday.  The action plan also identified the tasks Seals was expected to perform during her shift as the pharmacy nurse.

Seals testified in her deposition that this change in working hours did not entirely alleviate her problem with regard to having enough time to complete her job duties, but it was an improvement.  She also testified that she and Harris "weren't on bad terms" at that time.  Seals nevertheless refused to sign the action plan, telling Harris that she would not sign it without talking to her lawyer.

4

On November 18, 2004, Seals erred in performing her job duties in that she did not "sign out" two Tylenol #3 tablets in the narcotics book or the medication administration record ("MAR"); she gave an inmate medications that were intended for a different inmate, rather than retrieving the tablets from stock medication; and she failed to count narcotics at the end of her shift. Seals asserts that she could not sign out the Tylenol #3 tablets because "the MAR had been pulled by another nurse;" that the inmate who was given tablets intended for a different inmate actually got the correct medication, so no one was harmed; and that she did not count narcotics "because a white nurse (RN Julia Mitchell) who was supposed to count with her refused to do so."

On November 19, Harris gave Seals a written counseling for the errors Seals had made the previous day. With the exception of Mitchell, Seals was not aware of any other CMS employees who failed to count narcotics at the end of their shifts but were not disciplined. Seals did not think that she was given the written counseling, however, because of her race. When asked in her deposition whether she thought her age had anything to do with it, Seals testified, "Maybe not, but it just sounds like she was out to get me, because I messed up." The record does not reveal Mitchell's age.

On November 29, 2004, Seals gave an inmate Tylenol #3; however, she cannot recall if she gave him one tablet or two. That day she also gave another inmate Tylenol #3 tablets after the doctor had discontinued the prescription. Seals did not check the MAR before giving the inmate this medication, but asserts that "another nurse, Vera Miller (white female) had filed the MAR making it unavailable to Ms. Seals. Vera Miller was not disciplined for her actions."

On November 30, Harris gave Seals a final written warning for the errors Seals made on November 29. Seals did not feel that this final written warning was related to her race or age. Seals

did not know of any other CMS employees who gave the wrong narcotic medication to an inmate and who did not receive discipline for the error.

On December 1, the day after receiving the final written warning, Seals went to work at 8:00 a.m.  When Seals arrived at work, Harris asked Seals if Seals had finished updating the MARs. Seals checked with co-worker James Hamilton to find out if he had finished the MARs, as Hamilton had previously told Seals that he would help with this task.  Hamilton had not finished the MARs. Seals told Harris that the MARs were not finished.  Harris told Seals that Seals had plenty of time to complete the MARs, the MARs were her responsibility, and she would have to complete them.

Seals felt that she could not complete this task and also prepare for medication passes.  Miller suggested that Seals complete the MAR updates in the evening.  Seals told Miller that Harris would "have my tail" if she did not update the MAR before evening.  Seals asked Miller if Miller would help her, but Miller responded that she was too busy.  Seals then asked Harris for help, and Harris responded that she and the other nurses were busy and could not help.

After Harris told Seals that no one was available to help her, Seals decided to call Torrez because she felt that "she could not get through to Harris that Seals needed help."  Seals picked up a telephone book to find Torrez's telephone number.  According to Seals, as she was holding the book Harris grabbed it and told Seals that Harris would call Torrez.  Seals did not let go of the book. After less than one minute of both of them tugging on it, Harris let go.

After Harris let go of the book, Seals felt weak and asked a Certified Nursing Assistant ("CNA") to take her blood pressure.  At that time, Seals took medication to control her blood pressure.  When the CNA took Seals's blood pressure, at approximately 8:45 a.m., it was 175 over

97.  Seals then told Harris that she needed to go to a doctor.  Seals testified that Harris told her, "What you better do is get on back to work."

Seals did not return to work.  She called her husband and told him to meet her at their home. Seals then left Tucker and drove home.

Seals saw her doctor later that day.  During her visit with her doctor, Seals's blood pressure was 142 over 100, and he ordered her to take off work for five days due to hypertension.

Seals went on medical leave and never returned to work at CMS, but she did not resign immediately.  During the time that Seals was off on medical leave, CMS paid her 58 hours of "Paid Time Off" compensation.

On December 7, 2004, Seals sent a letter to Torrez explaining all of her complaints about CMS.  Seals admits that this letter was a complete representation of her complaints, as she did not exclude any complaint or grievance from the letter.  In the letter, Seals alleged that she had been treated less favorably than certain white nurses on some occasions and that Harris had retaliated against her for meeting with Torrez on September 13.  Seals did not allege that she was treated less favorably than younger nurses, harassed about her age, or otherwise subjected to any form of age discrimination.  Finally, Seals stated that she enjoyed her job at CMS and considered it a privilege to work for the company.

Some time during the first part of December 2004, Seals applied for a job with Golden Years Nursing Home.  Around the middle of that month, Golden Years offered Seals a job.  Seals told Golden Years that she was employed with CMS, but that she planned to resign her position at CMS to work at Golden Years.

Sometime after December 21, Seals received a memo from Torrez in response to her December 7 letter. Torrez stated in his letter to Seals that he had investigated her complaints and found no evidence that she was treated differently than other employees due to her race. He further found that her disciplinary actions were the result of her performance and that her work schedule was based upon the needs of her work unit. This letter imposed no discipline on Seals.

On December 27, Seals saw her doctor again. Seals told him that she had decided to resign from her job and take a new job, and Seals's doctor told her that she could return to work.

That day Seals delivered her resignation letter to CMS. This letter stated that she resigned "with much regret of having to leave this job." Seals further stated in the letter, "I have enjoyed working here," but "I must resign because of circumstances beyond my control."

When Seals resigned from CMS, her hourly rate of pay was $15.19. On January 3, 2005, Seals started working for Golden Years at an hourly rate of $15.27. She presently earns $16.97 per hour at Golden Years.

When asked during her deposition to identify what circumstances were beyond her control, prompting her resignation, Seals identified the following: (1) she could not get through to the staff that she needed help; (2) she was "stressed out;" (3) she was stressed because somebody was watching over her shoulder; and (4) the disciplinary actions issued by Harris. No one at CMS told Seals that she had to resign or that anyone at CMS wanted her to resign. Seals was never humiliated while she was employed by CMS. Seals further testified that, other than the incident in which she and Harris tugged on the telephone book, she never felt physically threatened or assaulted while she was employed with CMS.

Seals believed that CMS thought she would not resign.  Seals testified, "I believe that they might have not thought that I was going to quit.  That is what I am thinking.  They probably figured that I would just hang on."

When asked during her deposition to identify in what manner CMS retaliated against her, Seals identified the following: (1) the written disciplinary actions she received; and (2) increased workload and stress level.  Seals never heard anyone making any racial slurs, racial jokes, or statements about her race while she was employed with CMS.  The only remark Seals ever heard anyone make about her age was one incident when Harris said, "We are not as young as we used to be."

Seals has produced the affidavits of some of her coworkers, however, in support of her allegations of race and age discrimination.  Seals's former supervisor, Henrine Joyner, testified that Seals was treated differently than younger, white nurses at CMS in that "she was required to do the same work in a shorter period of time;" she was required to performed the additional task of passing out "on-person medications;" and she was ridiculed on the job while other nurses were not treated in this manner.  Joyner thus opined that "CMS treated Ms. Seals in an unfavorable manner due to her race and her age."  Another employee at Tucker, Shirley Owney, testified that she observed that "[t]he white nurses were not made to work as much as the black nurses."  Owney stated, "I believe that race was a factor in how Ms. Seals' supervisors treated her."

Although Seals stated that she enjoyed her job at CMS, Seals has also produced other evidence that she received negative treatment there.  Seals and another employee, Verna Kettle, both testified that Seals was required to work more weekends than other nurses, that Seals was denied time off work to attend the funeral of a family member, and that Harris treated Seals very rudely.

## II.

Seals alleges that CMS discriminated against her on the basis of her age and race in four ways: (1) she was given more work to do in a shorter amount of time than younger, white nurses; (2) she was subjected to unfair disciplinary actions; (3) she was not hired for another position that was available, and this position was filled by a white nurse; and (4) she was constructively discharged.  Seals further alleges that after she complained of race discrimination to Torrez, CMS retaliated against her by increasing her workload and taking unjustified disciplinary actions against her.

### A.      Race Discrimination

Under Title VII, an employer cannot discharge or otherwise "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race . . . ."  42 U.S.C. § 2000e-2(a)(1).  This provision prohibits disparate treatment of employees based on race, *see Tatum v. City of Berkley*, 408 F.3d 543, 553 (8th Cir. 2005), failure to hire or promote an employee due to his or her race, *see Rose-Maston v. NME Hosps., Inc.*, 133 F.3d 1104, 1109-10 (8th Cir. 1998), and constructive discharge, *see Tatum*, 408 F.3d at 551-52; *Kerns v. Capital Graphics, Inc.*, 178 F.3d 1011, 1016-17 (8th Cir. 1999).

#### 1.      Disparate Treatment

Because there is no direct evidence of discriminatory intent, Seals's disparate-treatment claim is analyzed under the burden-shifting framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973).  Under this framework, the plaintiff must first establish a prima facie case of discrimination by showing that (1) she belonged to a protected class, (2) she was qualified to perform her job, (3) she suffered an adverse employment action, and (4) she

10

was treated differently than similarly-situated members of the unprotected class. *Shoffstall v. Henderson*, 223 F.3d 818, 825 (8th Cir. 2000) (citing *Breeding v. Arthur J. Gallagher & Co.*, 164 F.3d 1151, 1156 (8th Cir. 1999)).

If the plaintiff does so, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for taking the adverse employment action. *Hammer v. Ashcroft*, 383 F.3d 722, 724 (8th Cir. 2004).   If the employer offers such a reason, the plaintiff must then present evidence sufficient to create a fact issue as to whether the employer's articulated reason is pretextual and to create a reasonable inference that race was a motivating factor. *McCullough v. Real Foods, Inc.*,  140 F.3d 1123, 1127 (8th Cir. 1998).

CMS does not argue that Seals is not a member of a protected group or that she was not qualified to perform her job.   CMS argues that Seals did not suffer an adverse employment action and has thus failed to establish the third element necessary for a prima facie case.

"An adverse employment action is a tangible change in working conditions that produces a material employment disadvantage." *Spears v. Mo. Dep't of Corr. & Human Res.*, 210 F.3d 850, 853 (8th Cir. 2000).   Termination, reduction in pay or benefits, and changes in employment that significantly affect an employee's career meet this standard, but minor changes or inconveniences do not. *Id.*   Generally, poor performance evaluations or disciplinary citations do not in themselves constitute an adverse employment action. *Id.* at 854.

Seals has produced evidence that she was required to perform more tasks in less time at work than white nurses.   Such a disparity in job requirements could produce a "material employment disadvantage" within the meaning of Title VII. *Cf. Wilmington v. J.I. Case Co.*, 793 F.2d 909, 915 (8th Cir. 1986) (supervisor's routine assignment of undesirable jobs to black employee, where white

11

employees rarely received such assignments, was evidence of racial discrimination).  Seals also testified that on one occasion she received a "written counseling" for failing to count narcotics, while a white nurse who failed to perform this task on the same date was not disciplined.  As explained above, disciplinary citations do not ordinarily constitute an adverse employment action.  The Eighth Circuit has noted, however, that negative employment reviews can constitute an adverse employment action in some circumstances.  *Green v. Franklin Nat'l Bank of Minneapolis*, 459 F.3d 903, 916 n.9 (8th Cir. 2006).  In this case, Seals testified that she was concerned about the disciplinary citations "because enough write-ups, you can lose your license."  Assuming that this testimony is true, as the Court must for purposes of this motion for summary judgment, these citations could "significantly affect" Seals's career in nursing.  *Cf. Charlton v. Paramus Bd. of Educ.*, 25 F.3d 194, 200 (3d Cir. 1994) ("[P]ost-employment blacklisting is sometimes more damaging than on-the-job discrimination . . . .  Such would be the case with [the plaintiff] if her teaching certificate is revoked.").  Seals has therefore produced evidence that she suffered an adverse employment action within the meaning of Title VII, meeting the third element necessary for a prima facie case.

The fourth element, that she was treated differently than similarly-situated members of the unprotected class, is established by the same evidence.  The white nurses who allegedly were required to perform less work were similarly situated to Seals in their positions, and Mitchell, a white nurse, allegedly committed the same error as Seals but received no discipline.

Because Seals has established a prima facie case of race discrimination, the burden shifts to CMS to articulate a legitimate, nondiscriminatory reason for its alleged actions.  *See Hammer*, 383 F.3d at 724.  CMS has offered no reason for its alleged disparate treatment of Seals in requiring her to perform more job duties in less time than white nurses.  While CMS asserts, and Seals admits, that

12

failure to count narcotics is an important job duty and such failure is a legitimate reason for discipline, CMS has offered no reason for treating Seals differently than Mitchell in this regard. CMS has thus failed to meet its burden of stating a legitimate, nondiscriminatory reason for treating Seals differently than white nurses in the terms and conditions of her employment.

CMS's motion for summary judgment as to Seals's Title VII disparate-treatment claim is denied.

### 2.        Failure to Promote

Seals alleges that CMS had "an opening for the day shift doctor's nurse that was not posted and Ms. Seals was not allowed to fill.  A white nurse . . . was hired for that job."  Although Seals does not explicitly allege that this position was more desirable than the position that Seals held at the time, the Court will treat this claim as one for failure to promote on the basis of race.

"To establish a prima facie case in a failure-to-promote case, a plaintiff must show: (1) that she was a member of a protected group; (2) that she was qualified and applied for a promotion to an available position; (3) that she was rejected; and (4) that a similarly qualified employee, not part of a protected group, was promoted instead."  *Rose-Maston*, 133 F.3d at 1109.

Seals has failed to establish the elements of a prima facie case on this claim.  Regarding the second element, Seals has not offered any evidence as to the required qualifications for the position, much less shown that she met those qualifications.  *See id.* at 1110 (plaintiff failed to establish prima facie case where she offered no evidence of the qualifications necessary for the position she sought and no evidence of her own qualifications).  Regarding the fourth element, Seals has produced no evidence of the qualifications of the white nurse who filled the position to show that they were "similarly qualified."

CMS's motion for summary judgment as to Seals's failure-to-promote claim is granted.

### 3.    Constructive Discharge

"A constructive discharge occurs when an employee resigns after the employer has created an intolerable working environment in a deliberate attempt to compel such a resignation." *Tatum v. City of Berkeley*, 408 F.3d 543, 551 (8th Cir. 2005). "To prove a case of constructive discharge, a plaintiff must show that: (1) 'a reasonable person in her situation would find the working conditions intolerable' and (2) 'the employer . . . intended to force the employee to quit.'" *Tatum v. Ark. Dep't of Health*, 411 F.3d 955, 960 (8th Cir. 2005) (quoting *Gartman v. Gencorp, Inc.*, 120 F.3d 127, 130 (8th Cir. 1997)).

"Constructive discharge requires considerably more proof than an unpleasant and unprofessional environment." *Jones v. Fitzgerald*, 285 F.3d 705, 716 (8th Cir. 2002). "Whether working conditions are sufficiently objectionable to support a claim for constructive discharge is determined by an objective standard, not the employee's subjective feelings." *Spears*, 210 F.3d at 854. The employee must give her employer a reasonable chance to work out the problems presented. *Davis v. KARK-TV, Inc.*, 421 F.3d 699, 706 (8th Cir. 2005); *Duncan v. Gen. Motors Corp.*, 300 F.3d 928, 935-36 (8th Cir. 2002). The intent element in a constructive discharge claim, however, "is satisfied by a demonstration that quitting was 'a reasonably foreseeable consequence of the employer's discriminatory actions.'" *Breeding*, 164 F.3d at 1159 (quoting *Summit v. S-B Power Tool*, 121 F.3d 416, 421 (8th Cir. 1997)).

Seals has produced evidence, through her deposition and the affidavits of other employees at Tucker, that she was ridiculed on the job, required to perform tasks that could not be completed in the time allowed, disciplined in allegedly unfair circumstances, required to work more weekends

than other nurses, treated rudely by her superiors, denied time off work to attend the funeral of a family member, and told that she had "better . . . get on back to work" when she informed her supervisor that she was ill and needed to see a doctor.

The parties do not dispute that Seals met with Torrez in September 2004 to discuss some of the problems that she allegedly experienced at work. Although Seals admits that Torrez addressed some of her concerns and that her working hours were adjusted to allow her more time to complete her duties, she also testified that her workload was increased. The parties do not dispute that when Seals attempted to contact Torrez again in December to address her concerns about her workload, Harris tried to physically take the telephone book away from her.

Of course, CMS has presented evidence that Seals's working conditions were not intolerable and that she actually enjoyed her job. The role of the Court in determining a motion for summary judgment, however, is not to weigh the evidence or assess the credibility of witnesses. If a jury believes the testimony presented by Seals and her coworkers, the jury could reasonably conclude that Seals's working conditions would not be tolerable to a reasonable person, that she gave CMS an opportunity to work out the problem, and that her resignation was foreseeable under the circumstances. CMS's motion for summary judgment as to Seals's constructive discharge claim is therefore denied.

**B.      Age Discrimination**

The Age Discrimination in Employment Act ("ADEA") makes it unlawful for an employer to discriminate against an employee on the basis of age if the employee is over 40 years old. 29 U.S.C. §§ 623(a), 631(a). Like Title VII, the ADEA prohibits discrimination with respect to compensation and terms, conditions, or privileges of employment. *Id.* § 623(a)(1).

15

Where, as here, the plaintiff puts forth no direct evidence of age discrimination, the Court must apply the *McDonnell Douglas* burden-shifting analysis, which first requires the plaintiff to demonstrate a prima facie case of age discrimination. *Breeding*, 164 F.3d at 1156. To do this, the plaintiff must show that: (1) she is within the protected class; (2) she was qualified to perform her job; (3) she suffered an adverse employment action; and (4) persons outside the protected class were not treated in the same manner. *Id.* The burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action. *Id.* If the employer does so, then the plaintiff must demonstrate that the employer's stated reason is pretextual and that the real reason for the adverse employment action was age discrimination. *Id.* at 1157.

As with Seals's race discrimination claim, CMS does not argue that Seals is not a member of the protected class or that she was not qualified for her job. The analysis of Seals's prima facie case thus turns on the third and fourth elements.

Seals offers less evidence to support her age discrimination claim than to support her race discrimination claim. Nevertheless, she has produced evidence that she was required to do more work in less time than younger nurses and that she was ridiculed on the job in situations where those nurses were not. The analysis of Seals's age discrimination claim is thus the same as for her race discrimination claim on this issue. As explained above, requiring an employee to perform more tasks in a shorter amount of time than other employees is discrimination in the terms and conditions of employment that could rise to the level of an adverse employment action. This evidence is sufficient to meet the minimum threshold of evidence necessary to establish a prima facie case. *See Davenport v. Riverview Gardens Sch. Dist.*, 30 F.3d 940, 944 (8th Cir. 1994) (threshold of proof necessary to make a prima facie case of employment discrimination is minimal).

CMS offers no reason for its alleged adverse action, and has thus failed to rebut Seals's prima facie case.  CMS's motion for summary judgment as to Seals's age discrimination claim is therefore denied.

## C.      Retaliation

Title VII prohibits an employer from retaliating against an employee because he has "made a charge" of unlawful discrimination or has "participated in any manner in an investigation, proceeding, or hearing under this subchapter."  *Cross v. Cleaver*, 142 F.3d 1059, 1071 (8th Cir. 1998) (quoting 42 U.S.C. § 2000e-3(a)).  To establish a claim of retaliation in violation of Title VII, a plaintiff must show the following elements: (1) the plaintiff filed a charge of harassment or engaged in other protected activity; (2) the plaintiff's employer subsequently took adverse employment action against him; and (3) the adverse action was causally linked to the plaintiff's protected activity.  *Id.*  "Once this *prima facie* showing is made, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions, and, if the employer meets that burden, the presumption of retaliation disappears."  *Id.* at 1071-72.  If the employer does this, the plaintiff has the burden to identify specific facts in the record showing that the offered reason was merely pretextual and that unlawful retaliation was a motivating factor for the decision.  *E.E.O.C. v. Kohler Co.*, 335 F.3d 766, 773 (8th Cir. 2003).

The first element is not in dispute: Seals engaged in a protected activity when she complained to Torrez in September 2004 that black employees were receiving less favorable treatment at work than white employees.  *See Buettner v. Arch Coal Sales Co.*, *Inc.*, 216 F.3d 707, 714 (8th Cir. 2000) (Title VII's prohibition against retaliation is not limited to protection of employees who file suit; it

17

"protects activities ranging from filing a complaint to expressing a belief that the employer has engaged in discriminatory practices").

As to the second element, CMS again argues that Seals did not suffer an adverse employment action. As described above, Seals has produced evidence that after her meeting with Torrez, her supervisors increased her workload and issued several disciplinary citations to her. While disciplinary citations do not usually constitute an adverse employment action under Title VII, Seals testified that such citations could have caused her to lose her license. As discussed above, such disparate treatment of an employee can constitute an adverse employment action under Title VII.

As to the third element, a close temporal connection between a plaintiff's protected activity and the employer's adverse employment action can suffice to show the "causal connection" necessary to establish a prima facie case of retaliation. The Eighth Circuit recently explained:

> Generally, "the threshold of proof necessary to establish a prima facie case is minimal." *Young v. Warner-Jenkinson Co.*, 152 F.3d 1018, 1022 (8th Cir. 1998). The timing of an adverse employment action in connection with the protected activity "can sometimes establish causation for purpose of establishing a prima facie case." *Sherman v. Runyon*, 235 F.3d 406, 410 (8th Cir. 2000). We have held that periods much longer than . . . three weeks . . . can be used to infer causation. *See Smith v. St. Louis Univ.*, 109 F.3d 1261, 1266 (8th Cir. 1997) (inference of a causal connection was found when there was a six month gap between the adverse action and the protected activity); *O'Bryan v. KTIV Television*, 64 F.3d 1188, 1193 (8th Cir. 1995). "An inference of a causal connection between a charge of discrimination and termination can be drawn from the timing of the two events, but in general more than a temporal connection is required to present a genuine factual issue on retaliation." *Peterson v. Scott County*, 406 F.3d 515, 524 (8th Cir. 2005) (citing *Smith v. Riceland Foods, Inc.*, 151 F.3d 813, 819-20 (8th Cir. 1998)). In *Peterson*, a two-week gap between termination and protected activity was "close enough to establish causation in a prima facie case." *Id.* at 525.

*Green*, 459 F.3d at 915.  *See also Buettner*, 216 F.3d at 715-16 ("The requisite causal connection may be proved circumstantially by showing the discharge followed the protected activity so closely in time as to justify an inference of retaliatory motive.").

The disciplinary citations that Seals received after her September meeting with Torrez were issued on November 19 and November 30, representing a time lapse of about two months.  The date or dates on which Seals's supervisors allegedly increased her workload are not specified in the record, but Seals testified that this occurred after her meeting with Torrez.

This temporal proximity, however, is not the only evidence of a causal link between Seals's September complaint of race discrimination and the allegedly unfair disciplinary actions and increase in duties.  When Seals attempted to contact Torrez again on December 1 about her workload, Harris attempted to take the telephone book away from Seals and then told Seals to "get on back to work" when Seals reported that she felt ill and needed to see her physician.  These actions, viewed in the context of the preceding events, lend support to Seals's claim that CMS sought to retaliate against her.  *See Wedow v. City of Kansas City, Mo.*, 442 F.3d 661, 675 (8th Cir. 2006) (plaintiff may prove causation with circumstantial evidence that justifies an inference of a retaliatory motive, and such evidence must be evaluated along with temporal proximity).

As noted above, CMS has presented legitimate, nondiscriminatory reasons for the disciplinary citations – Seals's errors in performing her job.  CMS offers no explanation, however, for its alleged increase in Seals's workload and failure to discipline a white nurse who erred in the same manner as Seals.  CMS has thus failed to rebut Seals's prima facie case of retaliation, and its motion for summary judgment as to this issue is denied.

**D.      Intentional Infliction of Emotional Distress**

To establish a claim of intentional infliction of emotional distress, known in Arkansas as the tort of outrage, the plaintiff must prove that: (1) the defendant intended to inflict emotional distress or knew or should have known that emotional distress was the likely result of his conduct; (2) the conduct was extreme and outrageous and utterly intolerable in a civilized community; (3) the defendant's conduct was the cause of the plaintiff's distress; and (4) the plaintiff's emotional distress was so severe that no reasonable person could be expected to endure it. *Fuqua v. Flowers*, 341 Ark. 901, 907, 20 S.W.3d 388, 391-92 (2000). The plaintiff's emotional distress must be not only severe, but must be reasonable and justified under the circumstances. *M.B.M. Co., Inc. v. Counce*, 268 Ark. 269, 280, 596 S.W.2d 681, 687 (1980). Extreme and outrageous conduct means "conduct that is so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society." *Id.* "Merely describing the conduct as outrageous does not make it so." *Fuqua*, 341 Ark. at 907, 20 S.W.3d at 392. "In other words, liability does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." *Ingram v. Pirelli Cable Corp.*, 295 Ark. 154, 158, 747 S.W.2d 103, 105 (1988).

Arkansas courts have thus taken a strict view in recognizing outrage claims, especially in employment relationship situations. *Smith v. Am. Greetings Corp.*, 304 Ark. 596, 601, 804 S.W.2d 683, 686 (1991). *Smith* involved a plaintiff who had a dispute with his supervisor at work. *Id.* at 599, 804 S.W.2d at 685. The plaintiff later tried to discuss the matter, and the supervisor allegedly hit him. *Id.* The plaintiff claimed that he was fired the next day because the defendant "found that he had provoked management personnel into a fight." *Id.* The Arkansas Supreme Court upheld the

20

trial court's dismissal of the plaintiff's case for failure to state a claim, stating that "the employer's conduct did not come close to meeting" the standard for extreme and outrageous conduct required to support an outrage claim. *Id.* at 597, 601-02, 804 S.W.2d at 684, 686.

In support of her outrage claim, Seals points to the same evidence that supports her claim of constructive discharge. Even assuming that Seals was constructively discharged, CMS's conduct does not rise to the level of extreme, outrageous, atrocious behavior that would give rise to a claim for the tort of outrage. While the manner in which an employee's discharge occurs may render the employer liable, *Harris v. Ark. Book Co.*, 287 Ark. 353, 356, 700 S.W.2d 41, 43 (1985), even cases involving extended periods of demeaning treatment and a campaign orchestrated to result in an employee's termination have been held not to meet this standard, *see Ingram*, 295 Ark. 154, 747 S.W.2d 103; *Sterling Drug, Inc. v. Oxford*, 294 Ark. 239, 743 S.W.2d 380 (1988).

Seals emphasizes the incident in which Harris tried to pull the telephone book away from her, repeatedly asserting that "she was threatened and physically assaulted by her supervisor." If hitting an employee is not extreme and outrageous behavior within the meaning of Arkansas tort law, however, pulling on a telephone book cannot be.

Seals has neither alleged nor produced evidence that CMS engaged in the type of extreme and outrageous conduct that would support a claim for the tort of outrage. CMS's motion for summary judgment as to this claim is therefore granted.

## CONCLUSION

Seals has produced evidence sufficient to raise a genuine issue of material fact as to whether she was subjected to race and age discrimination in the terms and conditions of her employment. CMS's motion for summary judgment as to Seals's claims for disparate treatment and constructive

discharge under Title VII and the ADEA is denied.  Seals has also produced evidence sufficient to raise a genuine issue of material fact as to whether CMS retaliated against her for making a complaint of race discrimination.  CMS's motion for summary judgment as to Seals's Title VII retaliation claim is denied.

CMS, however, has established a prima facie case of entitlement to summary judgment as to Seals's claims for failure-to-promote under Title VII and intentional infliction of emotional distress under Arkansas law.  CMS's motion for summary judgment is therefore granted as to these claims.

IT IS SO ORDERED this 30th day of January, 2007.

_____
J. LEON HOLMES
UNITED STATES DISTRICT JUDGE